UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ULISES CHAVEZ,<br>Petitioner,<br>v.<br>MARTIN GAMBOA,<br>Respondent. | No. 1:22-cv-00920-JLT-EGC (HC)<br>**FINDINGS AND RECOMMENDATIONS FOLLOWING EVIDENTIARY HEARING**<br>[7-DAY DEADLINE] |

Petitioner Ulises Chavez is a state prisoner proceeding with appointed counsel on a petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1.) Petitioner filed the instant request nearly nine years after the limitations period expired. Following remand from the Ninth Circuit, the undersigned held an evidentiary hearing on August 4 through 7, 2026, on whether Petitioner is entitled to equitable tolling of the limitations period on account of mental impairment.

The evidence establishes that Petitioner has a genuine, lifelong mental impairment. However, that impairment did not cause Petitioner to file nearly nine years late. A petitioner who shows that his mental impairment satisfies the first prong of the governing test is not entitled to equitable tolling on that basis alone. He must also show that he exercised reasonable diligence under the totality of the circumstances, including the assistance reasonably available to him, and that his impairment, rather than a lack of diligence, caused the untimely filing. *See Bills v. Clark*,

628 F.3d 1092, 1100-01 (9th Cir. 2010). Petitioner bears the burden on both prongs, and this case turns on the second. Despite his limitations, Petitioner kept his appellate record for years, maintained regular contact with his family, including an uncle who inquired about an appeal on his behalf, and repeatedly obtained help from other prisoners, both with his correspondence and in pursuing an administrative grievance. He also attended adult education classes, met annually with correctional counselors, and had access to the law library and to prisoners who offered legal assistance. Yet, for years, Petitioner did not ask anyone whether anything could be done about his conviction or sentence, and once he obtained assistance, he still did not file promptly. On this record, Petitioner has not shown that he acted with reasonable diligence or that his impairment caused his untimely filing.

Having considered the evidence admitted at the evidentiary hearing, the testimony, and the parties' submissions and objections, the undersigned finds that Petitioner has not carried his burden of establishing entitlement to equitable tolling and recommends that the motion to dismiss be GRANTED and the petition be DISMISSED WITH PREJUDICE as untimely.

## I. BACKGROUND

### A. Conviction, Direct Appeal, and State Collateral Proceedings

In 2010, a Tulare County jury convicted Petitioner of assault on a peace officer with a firearm, shooting at an occupied motor vehicle, attempted voluntary manslaughter, and related offenses, and found true several sentencing enhancements. (Doc. 12-1.)[1] On December 7, 2010, the trial court sentenced Petitioner to a determinate term of twenty-eight years and eight months. (*Id.*) That same day, Petitioner and his trial counsel signed a notice of appeal. (Ex. A at 1-2.)[2] Appellate counsel was appointed on March 1, 2011. (Ex. A at 102.) On June 5, 2012, the California Court of Appeal, Fifth Appellate District, affirmed. (Doc. 12-2.) Petitioner did not petition for review in the California Supreme Court.

---

[1] References to "EHT" are to the evidentiary hearing transcript (Docs. 116-119), cited by volume and page (e.g., "1EHT 26"). References to "Ex." are to exhibits admitted at the hearing.

[2] Respondent's Exhibit A was admitted only to show that the documents it contains were signed by or served on Petitioner or filed in his appeal, and the dates on which they were filed. (4EHT 39-40.) It is cited here only for those purposes.

More than eight years later, Petitioner filed a *pro se* petition for writ of habeas corpus in the Tulare County Superior Court, constructively filed November 17, 2020. (Doc. 12-3.) His petition was denied on November 25, 2020. (Doc. 12-4.) Petitioner then filed a petition in the California Court of Appeal on January 26, 2021, which was denied on April 30, 2021 (Docs. 12-5, 12-6), and a petition in the California Supreme Court on June 13, 2021, which was denied on October 13, 2021, with a citation to *In re Robbins*, 18 Cal. 4th 770, 780 (1998), that "courts will not entertain habeas corpus claims that are untimely" (Docs. 12-7, 12-8).

**B. Proceedings in This Court**

Petitioner filed the instant petition on July 4, 2022. (Doc. 1.) Respondent moved to dismiss the petition as untimely under 28 U.S.C. § 2244(d). (Doc. 11.) The Court granted the motion and dismissed the petition. (Docs. 19, 21.) On appeal, the Ninth Circuit vacated the judgment and remanded for further factual development of Petitioner's claim to equitable tolling based on mental impairment. (Doc. 28.) On remand, the then-assigned magistrate judge appointed counsel, expanded the record (Doc. 46), and set an evidentiary hearing (Doc. 49). The undersigned held an evidentiary hearing on August 4 through 7, 2026, on whether Petitioner is entitled to equitable tolling of the limitations period on account of mental impairment. (Docs. 116-119.)

**C. The Evidentiary Hearing**

At the evidentiary hearing, Petitioner testified and presented the testimony of his uncle, Jaime Magaña Cruz; his mother, Yesenia Magaña Cruz; his sister, Jennifer Chavez; community center director Connie Huerta; and neuropsychologist Carmen C. Velazquez, Ph.D. Respondent presented the testimony of Kayla Johnson, the principal of the correctional education program at Avenal State Prison; Tami Leffler; and Richard Farley, the Litigation Coordinator at Avenal State Prison. The undersigned admitted Petitioner's Exhibits 2, 3, 19, and 20, and portions of Respondent's Exhibits A through F, as reflected on the record. (4EHT 33-73; 2EHT 61, 177, 220, 244.)[3] At the close of the hearing, the undersigned directed the parties to file written briefs

[3] Respondent's briefing relies on several materials that were lodged before the hearing but not admitted at it, including Petitioner's prison mental health records, Dr. Middleton's second report, and certain records lodged at Docs. 35-4 through 35-9. (*See* Doc. 122 at 2 n.2, 4-5; 4EHT 74-75.) Respondent contends these materials are part of

addressing the calculation and duration of any tolling, the test set out in *Bills v. Clark*, 628 F.3d 1092 (9th Cir. 2010), its application in *Blackman v. Cisneros*, 122 F.4th 377 (9th Cir. 2024), but-for causation, and seven other identified authorities. (4EHT 89-91, 99-100.) The parties thereafter filed post-hearing briefs, proposed findings of fact and conclusions of law, and objections. (Docs. 120-125.)

## II. LEGAL STANDARDS

### A. AEDPA's Limitations Period

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes a one-year limitations period on petitions for writ of habeas corpus filed by state prisoners. 28 U.S.C. § 2244(d)(1). As relevant here, the period runs from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." *Id.* § 2244(d)(1)(A). The period is statutorily tolled while a "properly filed application for State post-conviction or other collateral review" is pending. *Id.* § 2244(d)(2). A state petition that is untimely under state law is not "properly filed." *Pace v. DiGuglielmo*, 544 U.S. 408, 417 (2005). And a state petition filed after the limitations period has expired cannot revive it. *Ferguson v. Palmateer*, 321 F.3d 820, 823 (9th Cir. 2003).

### B. Equitable Tolling Based on Mental Impairment

AEDPA's limitations period is subject to equitable tolling, but only if the petitioner shows "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010) (quoting *Pace*, 544 U.S. at 418). The diligence required is "reasonable diligence," not "maximum feasible diligence." *Id.* at 653 (citations omitted). The petitioner bears the burden of establishing both elements. *Pace*, 544 U.S. at 418.

Where, as here, the petitioner contends that a mental impairment prevented timely filing,

---

the record by virtue of the order expanding the record (Doc. 46). The undersigned need not resolve that question. The order permitting the parties to reference filings at the hearing likewise provided that it did "not convert any factual assertion contained in a pleading or other filing into evidence." (Doc. 98 at 2.) The findings and recommendations below rest only on the testimony and exhibits admitted at the hearing and on the state court filings lodged at Doc. 12, of which the undersigned may take judicial notice, and the result would be the same if the additional materials were considered.

the Ninth Circuit applies a two-part test. First, the petitioner must show that his mental impairment was an extraordinary circumstance beyond his control, by demonstrating that the impairment was so severe that either (a) he was "unable rationally or factually to personally understand the need to timely file," or (b) his "mental state rendered him unable personally to prepare a habeas petition and effectuate its filing." *Bills*, 628 F.3d at 1099-1100. Second, the petitioner must show "diligence in pursuing the claims to the extent he could understand them, but that the mental impairment made it impossible to meet the filing deadline under the totality of the circumstances, including reasonably available access to assistance." *Id.* at 1100. With respect to diligence, "the petitioner must diligently seek assistance and exploit whatever assistance is reasonably available." *Id.* at 1101. The court should "examine whether the petitioner's mental impairment prevented him from locating assistance or communicating with or sufficiently supervising any assistance actually found." *Id.*

In applying this standard, the district court must (1) find whether the petitioner has made a non-frivolous showing of a severe mental impairment during the filing period that would entitle him to an evidentiary hearing; (2) determine, after considering the record, whether the petitioner has satisfied his burden that he was in fact mentally impaired; (3) determine whether the impairment made it impossible to timely file on his own; and (4) consider whether the circumstances demonstrate the petitioner was otherwise diligent in attempting to comply with the filing requirements. *Id.* at 1100-01.

The "impossibility" requirement is not literal. *Blackman*, 122 F.4th at 382. The petitioner must show that the impairment was "a but-for cause of any delay." *Id.* (quoting *Milam v. Harrington*, 953 F.3d 1128, 1132 (9th Cir. 2020)); *Forbess v. Franke*, 749 F.3d 837, 841 (9th Cir. 2014). Where the petitioner had assistance, the impairment may remain a but-for cause if it prevented him from monitoring that assistance and such monitoring would have prevented the delay. *Milam*, 953 F.3d at 1133; *Blackman*, 122 F.4th at 382. A petitioner's demonstrated ability to file state habeas petitions during the relevant period indicates that the impairment did not make timely filing impossible. *Blackman*, 122 F.4th at 382 (citing *Stancle v. Clay*, 692 F.3d 948, 958-59 (9th Cir. 2012)); *Orthel v. Yates*, 795 F.3d 935, 939 n.3 (9th Cir. 2015); *Yow Ming Yeh v.*

*Martel*, 751 F.3d 1075, 1077-78 (9th Cir. 2014).

## III. FINDINGS OF FACT

Based on the testimony and exhibits admitted at the evidentiary hearing, and having assessed the credibility of the witnesses, the undersigned makes the following findings of fact.[4]

### A. Petitioner's Cognitive Impairment

1. Petitioner has had significant cognitive limitations since early childhood. He was placed in special education when he entered preschool at age four, received speech and language services, and remained in special day classes on an individualized education plan. (Ex. 3 at 34, 66; 1EHT 52-53, 79-81; 2EHT 122, 132-33.) In 1996, at age five, he was referred to the Central Valley Regional Center for suspected intellectual disability, but no evaluation was completed. (Ex. 3 at 152; Ex. 2 at 5, 61; 2EHT 144-46.)

2. In July 2008, at age seventeen, Petitioner obtained a full-scale IQ score of 66 on the Wechsler Adult Intelligence Scale-III, with a performance IQ of 75, and an adaptive behavior composite of 69 on the Vineland Adaptive Behavior Scales. (Ex. 2 at 48-53.) Dr. Thomas Middleton, who administered those tests in connection with pretrial proceedings, placed Petitioner between mild intellectual disability and borderline intellectual functioning, ultimately diagnosing borderline intellectual functioning. (*Id.* at 50-53.) In a later evaluation, Petitioner scored 69 on the Kaufman Brief Intelligence Test. (2EHT 205.) Earlier, nonverbal testing had placed Petitioner's fluid reasoning in the below-average range. (Ex. 2 at 51, 122-23; 2EHT 117-18, 123-24, 187-89.)

3. Dr. Velazquez, whom the undersigned finds qualified as an expert in neuropsychology, diagnosed Petitioner with intellectual disability in the mild range, finding significantly subaverage intellectual functioning, significant deficits in adaptive functioning in the conceptual, social, and practical domains, and onset during the developmental period. (Ex. 19 at

---

[4] Dr. Velazquez's report and testimony recount statements from Mr. Marquez, who did not testify and whose affidavit (Ex. 1) was not admitted. Those statements are considered only as part of the basis for Dr. Velazquez's opinion, Fed. R. Evid. 703, and not as substantive evidence of the facts asserted. Respondent argues that Dr. Velazquez's opinions are inadmissible to the extent they rest on Mr. Marquez's statements. (Doc. 125 at 5-7.) The undersigned need not resolve that objection, because the recommendation would be the same regardless.

3, 27, 90; 2EHT 129-30, 163-64, 174-76.) Her opinion is well supported by Petitioner's educational and developmental history. The undersigned credits Dr. Velazquez's testimony that Petitioner has a lifelong cognitive impairment that has not materially changed. (2EHT 192.) The undersigned notes, however, that Dr. Velazquez's assessment focused on Petitioner's functioning in the open community, that she did not purport to describe what Petitioner could or could not do in prison between 2012 and 2019, and that she relied in part on statements from fellow prisoner Juan Carlos Marquez, who did not testify. (Ex. 19 at 30; 2EHT 152-153, 190-95, 210-11.)

4. When Petitioner entered the California Department of Corrections and Rehabilitation ("CDCR") in 2011, he could not read or write in English or Spanish. (1EHT 125-26.) Beginning in 2011, his reading scores on the Test of Adult Basic Education ("TABE") remained fairly consistent between approximately 1.8 and 2.5. (Ex. B at 1-2; 3EHT 26.) Because his TABE reading score was below 4.0, CDCR designated him as requiring "effective communication," meaning that staff used simple English spoken slowly and clearly during classification events. (Ex. D; 2EHT 239-41; 4EHT 8-9.) Petitioner has remained enrolled in Adult Basic Education I since 2014. (1EHT 118-19; 3EHT 31-32.)

5. Petitioner's measured academic skills improved during his incarceration. From October 2016 through March 2017, he scored repeatedly between the fourth- and seventh-grade levels in reading on the Comprehensive Adult Student Assessment Systems ("CASAS"), and Ms. Johnson testified, and the undersigned finds, that those scores reliably reflect his performance during that period. (Ex. B at 1; 3EHT 30-31.) Beginning in 2019, Petitioner's reading scores returned to approximately the second-grade level. (Ex. B at 1; 3EHT 42-43.)[5]

**B. Events Following Sentencing (2010-2015)**

6. According to Petitioner's uncle, Petitioner wanted to appeal his sentence, although Petitioner gave no specific reason, and the uncle believed it was because of the length of the sentence. (1EHT 34, 37-38.) Petitioner's uncle then spoke to Petitioner's trial counsel about an

[5] Respondent asks the Court to find that Petitioner stopped giving his best effort on standardized tests beginning in 2019. (Doc. 123 ¶ 113.) The cited testimony does not support that finding; Ms. Johnson testified to a decline in scores, not to its cause. (3EHT 30-38, 42-45.) The undersigned makes no finding on the reason for the decline, which in any event postdates the period most relevant here.

appeal and Petitioner's uncle relayed his understanding, based on his conversation with trial counsel, that Petitioner would have to wait five years before he could appeal. (1EHT 26, 38.) Petitioner responded, "okay." (1EHT 38.)

7. Between April 7, 2011, and October 19, 2012, appellate counsel sent Petitioner ten pieces of legal mail, including two boxes containing his appellate record. (Ex. E at 77; 1EHT 135, 160-62.) Petitioner asked fellow prisoners to read to him the cards he received from appellate counsel. (1EHT 130, 160-62.) Apart from the cards, when asked whether he knew what was in his "legal mail" and "paperwork," Petitioner answered, "I have no idea. I never looked at it. I never read it." (1EHT 130.) He did not ask anyone to read or explain the legal papers. Asked what he would have done with a substantial filing from appellate counsel, he testified that he would have "[j]ust put it away," and that he would not have asked anyone to read it to him "because I don't want to share nothing with nobody. Because I don't know nobody there. I don't trust anybody to read it." (1EHT 164.) Petitioner attributed that choice to advice he received in county jail before trial not to share his legal papers because they could be used against him. (1EHT 131, 164-65.)

8. Petitioner kept his legal papers. He testified that he took all of his documents with him when he was transferred from Ironwood State Prison to Calipatria State Prison. (1EHT 165.) He was later transferred to Pleasant Valley State Prison in June 2015 (Ex. E at 78) and then to Avenal State Prison, and in 2019 he gave Mr. Marquez "everything I had"—all of the materials appellate counsel had sent him. (1EHT 134-35.)

9. From his arrival in CDCR, Petitioner regularly obtained help from other prisoners with reading and writing. He asked fellow prisoners ("always different people") to write letters to his mother in Spanish, to read her letters to him, and to help him prepare catalog orders. (1EHT 126-27, 155-58.) Petitioner maintained contact with his family by letter and telephone. (1EHT 94-95, 126-28.)

10. While at Calipatria, Petitioner shared a cell with Pedro Franseca, and the two discussed their cases and the amount of time each had been sentenced to serve.[6] (1EHT 132-33.)

11. Approximately five years after Petitioner's sentencing, his uncle traveled to Tulare

[6] The transcript spells the name "Franseca" while Petitioner's filings spell it "Fonseca." The undersigned uses the

County to pursue an appeal on Petitioner's behalf. Trial counsel had retired, and another attorney in the public defender's office told the uncle that the time to appeal was sixty to ninety days, not five years, and that there was "nothing else to do because it was already too late for appeal." (1EHT 26-28.) The uncle relayed that information to Petitioner. (1EHT 28.)

**C. Petitioner's Circumstances from 2015 to 2019**

12. At each prison where he was housed, Petitioner received an orientation, met with a correctional counselor at intake and annually thereafter, and had access to correctional counselors during weekly office hours, to housing unit officers, and to a law library staffed by a librarian and prisoner clerks who could help prisoners locate materials and understand what they were reading. (2EHT 233-39, 248-50; 3EHT 154-57; 4EHT 5-6.) Experienced prisoners on each yard, colloquially referred to as "legal beagles," also offered informal legal assistance. (3EHT 156-58.) Asked what would happen if a prisoner said he did not like his sentence, Mr. Farley testified that the prisoner would be told to "[s]peak to your counselor," who might refer him to the law library or suggest contacting an attorney. (2EHT 250.) The parties stipulated that Mr. Farley's testimony regarding these processes and services applies to each of the four prisons at which Petitioner has been housed throughout his time in CDCR custody. (3EHT 152-54.) At his annual reviews, Petitioner discussed his classification, his custody level points, and his programming. He understood that he could not move to a lower custody level because of his "P-code." (1EHT 139-41.)

13. In 2017, Petitioner pursued an administrative remedy after the prison mailroom withheld photographs he had ordered. He submitted a request for an interview in January 2017, filed a formal grievance in February 2017, and submitted a further response after the administration responded, in August 2017. (Ex. F at 59-63, 65-66; 3EHT 129-35.) Petitioner told a CDCR evaluator that filing the grievance "was his idea and that it was his questions that he wanted to answer, but he had assistance in scribing." (3EHT 150-51.) The handwriting on the forms is not uniform, which is consistent with Petitioner's having had help writing them. (3EHT

---

transcript spelling.

145-46.)

14. Petitioner's sister testified that she visited him in prison more than thirteen times between his trial in 2010 and the COVID-19 pandemic. (1EHT 67-68; *see* Ex. E at 78.)

15. There is no evidence that, between late 2015 and 2019, Petitioner asked any family member, correctional counselor, staff member, law library worker, or fellow prisoner whether anything could be done about his conviction or sentence. Although Petitioner kept two boxes containing his legal papers, Petitioner chose not to show those papers to anyone. (*See supra* Findings of Fact ¶¶ 7-8.) Petitioner filed nothing before 2019, did not ask Mr. Franseca for help, and testified that he never asked prison staff for help with reading. (1EHT 131, 134, 158, 164-65.)

16. Dr. Velazquez testified that Petitioner can identify a goal, recognize that he cannot accomplish it alone, and ask others for help; that "[i]f he wanted to, he would ask someone for help, for sure"; and that if Petitioner could trust a person, he would go to that person for help. (2EHT 196-97, 199, 201.) She also testified that Petitioner's conceptual deficits make it "hard for him to understand what he's missing," and that his ability to seek help depends on the complexity of the task. (2EHT 196, 208-09.)

**D. Assistance from Mr. Marquez and the Collateral Filings (2019-2022)**

17. In 2019, at Avenal, Mr. Franseca raised the subject of Petitioner's sentence and offered to introduce Petitioner to Mr. Marquez, a prisoner who was helping Mr. Franseca with his own case. (1EHT 132-33.) Petitioner did not ask for the introduction. (1EHT 133-34.) Because Mr. Franseca vouched for Mr. Marquez, Petitioner trusted him and gave him all of the legal papers he had kept. (1EHT 134-35.)

18. Mr. Marquez reviewed the papers, identified the claims, and drafted the pleadings. (1EHT 135-36.) In 2019, he told Petitioner that Petitioner had missed a deadline, and after Petitioner asked what that meant, Petitioner understood that he was "too late" and was "shock[ed]." (1EHT 143, 169.) Petitioner copied the pleadings Mr. Marquez prepared in his own handwriting and filed them as written. (1EHT 136-37.) Petitioner does not understand the claims raised, the meaning of habeas corpus, or the concept of equitable tolling. (1EHT 136-39, 165-67.)

19. Petitioner visited the Avenal law library on several occasions between July 2019

and April 2020. (Ex. E at 1-6.)

20. With Mr. Marquez's assistance, Petitioner filed three state habeas petitions between November 2020 and June 2021, and filed the instant federal petition on July 4, 2022, 264 days after the California Supreme Court denied relief. (Docs. 1, 12-3–12-8.) The record contains no evidence explaining the time between Petitioner's introduction to Mr. Marquez in 2019 and the filing of the first state petition on November 17, 2020, or the time between October 13, 2021, and July 4, 2022.[7]

### E. Credibility

21. The undersigned generally credits Petitioner's testimony that he did not understand the legal process, the claims Mr. Marquez raised, or AEDPA's filing deadline. The undersigned declines Respondent's invitation to find broadly that Petitioner testified falsely about his understanding of his appeal. (Doc. 123 ¶¶ 12, 19, 23.) The undersigned's conclusions below do not depend on discrediting Petitioner. Instead, the conclusions below largely rest on Petitioner's own testimony about what he did and did not do. Similarly, the undersigned also declines to address Respondent's challenge to Petitioner's uncle's credibility on the uncle's account of trial counsel's advice that there had to be a five-year waiting period because the federal petition describes the advice as seven years. (Doc. 125 at 10-11 & n.5; Doc. 1 at 11.) Either way, the conclusions below do not decide whether the period between 2011 and 2015 independently supports tolling. Thus, the challenge is unnecessary.

## IV. DISCUSSION

### A. The Petition Is Untimely Absent Equitable Tolling

The California Court of Appeal affirmed Petitioner's conviction on June 5, 2012. That decision became final thirty days later, and Petitioner then had ten days to petition for review in the California Supreme Court. Cal. R. Ct. 8.366(b)(1), 8.500(e)(1). Because the tenth day, July 15, 2012, fell on a Sunday, the time to seek review expired on Monday, July 16, 2012. *See* Cal.

---

[7] The record also does not establish when Mr. Marquez drafted the first state petition. Although counsel's questions at the hearing referred to Petitioner's "papers in 2019," Petitioner did not testify to when the pleadings were prepared. (1EHT 132-33, 136; see Doc. 124 at 9-10.) Therefore, the undersigned declines Respondent's request to find that Petitioner held a completed petition for more than eleven months before filing it (Doc. 125 at 21-23, 31-32).

Code Civ. Proc. § 12a. The limitations period began the following day and expired on July 16, 2013.[8] *See Patterson v. Stewart*, 251 F.3d 1243, 1246 (9th Cir. 2001).

Petitioner is not entitled to statutory tolling. His first state petition was filed on November 17, 2020, more than seven years after the limitations period expired, and therefore could not toll it. *Ferguson*, 321 F.3d at 823. In addition, the California Supreme Court denied Petitioner's final state petition as untimely, so it was not "properly filed." *Pace*, 544 U.S. at 417. Petitioner concedes that statutory tolling is unavailable. (Doc. 120 at 3-5.)[9] No alternative trigger date under section 2244(d)(1)(B)-(D) applies. Absent equitable tolling, the petition, filed July 4, 2022, is untimely by nearly nine years. To render it timely, Petitioner must establish entitlement to equitable tolling for the entire 3,275-day period from July 16, 2013, through July 4, 2022. (*See* Doc. 120 at 5.)

**B. Petitioner Has Not Established Entitlement to Equitable Tolling**

*1. Petitioner has a significant cognitive impairment*

The first two steps of the *Bills* framework are satisfied. The Ninth Circuit's remand and this Court's order setting an evidentiary hearing reflect that Petitioner made a non-frivolous showing of severe mental impairment. And the evidence at the hearing establishes that Petitioner has a genuine, lifelong cognitive impairment. Dr. Velazquez's diagnosis of mild intellectual disability is supported by a full-scale IQ of 66, a brief intelligence score of 69, an adaptive behavior composite of 69, special education from age four, and a regional center referral at age five. (*See supra* Findings of Fact ¶¶ 1-3.) Respondent emphasizes Dr. Middleton's 2008 diagnosis of borderline intellectual functioning and the trial court's finding that Petitioner was competent to stand trial. (Doc. 122 at 2-3.) But competency to stand trial is a different inquiry from the one *Bills* requires, and the undersigned need not resolve the precise diagnostic label. Whether characterized as mild intellectual disability or borderline intellectual functioning, Petitioner's

---

[8] Respondent calculates the deadline as July 15, 2013. (Doc. 123 at 17.) The one-day difference is immaterial, and the undersigned uses the later date, which favors Petitioner.

[9] At the hearing, the undersigned stated that the limitations period was tolled while Petitioner's state habeas petitions were pending and excluded certain post-2020 records on that basis. (4EHT 44-45, 55-56.) As explained above, statutory tolling is unavailable because the state petitions were filed after the limitations period expired.

impairment is real, longstanding, and properly considered under *Bills*. *See Chatman v. Hill*, 585 F. App'x 726, 727-28 (9th Cir. 2014).

*2. Severity of the impairment*

Under the first *Bills* prong, Petitioner contends both that he could not understand the need to timely file and that he could not personally prepare and file a petition. (Doc. 120 at 6-7.) The evidence on the former is mixed. Petitioner wanted to appeal on the day he was sentenced, discussed his sentence with a fellow prisoner, and understood what it meant to have missed a deadline once it was explained to him. (*See supra* Findings of Fact ¶¶ 6, 10, 18.) The evidence on the latter is stronger: during the limitations year, Petitioner read at roughly a second- to third-grade level and required effective-communication accommodations. (*See supra* Findings of Fact ¶ 4.) Respondent's reliance on Petitioner's seventh-grade-level scores is misplaced as to the limitations year itself, because those scores were obtained in 2017, nearly four years after the deadline. (*See supra* Findings of Fact ¶ 5.)

The undersigned need not definitively resolve the first prong. As in *Blackman*, the second prong is dispositive. *See* 122 F.4th at 387 (declining to reach first prong where petitioner failed to satisfy the second). The undersigned therefore assumes, without deciding, that Petitioner's impairment rendered him unable personally to prepare a habeas petition and effectuate its filing during the limitations period.

*3. Petitioner has not shown that his impairment, rather than a lack of diligence, caused the untimely filing*

The second *Bills* prong asks whether, under the totality of the circumstances and in light of reasonably available assistance, Petitioner's impairment made it impossible to meet the deadline—that is, whether it was a but-for cause of the delay. 628 F.3d at 1100; *Blackman*, 122 F.4th at 382. Because Petitioner seeks tolling for more than nine years, he must show reasonable diligence throughout that period. *Smith v. Davis*, 953 F.3d 582, 598-99 (9th Cir. 2020). The undersigned considers the relevant periods in turn.

i. <u>July 2012 through 2015</u>

This period, which includes the limitations year, presents Petitioner's strongest argument.

Petitioner could not read his appellate papers, and his uncle had told him he could not appeal for five years. (*See supra* Findings of Fact ¶¶ 4, 6.) Petitioner argues that a person of ordinary intelligence would have recognized the inconsistency between that advice and the steady stream of legal mail from appellate counsel, and that his impairment prevented him from doing so. At the same time, the principal reason Petitioner did nothing during this period appears to be the misinformation relayed by his uncle, that he needed to wait five years, which is an obstacle that would have affected any prisoner who relied on it. Absent consideration of mental impairment under *Bills*, an "inability [to correctly] calculate the limitations period is not an extraordinary circumstance warranting equitable tolling." *Rasberry v. Garcia*, 448 F.3d 1150, 1152-54 (9th Cir. 2006) (holding that a prisoner litigant's lack of legal sophistication or inability to calculate the starting and ending dates for the statutory limitations period is a form of ignorance of the law).

Petitioner is not entitled to equitable tolling for this period. The record does not show that his impairment, rather than his uncle's misinformation and his own decision not to share his legal papers, caused his inaction. He declined to have anyone read or explain the legal papers themselves, not because he could not obtain that help, but because he did not want to share them. (*See supra* Findings of Fact ¶¶ 7, 9.) Petitioner was also in contact with his family throughout this period, and nothing prevented him from asking his uncle, or anyone else, whether the five-year advice was correct. (*See id.* ¶¶ 9, 11.) The misinformation from a relative, combined with a deliberate decision not to seek help with one's legal papers, is not an extraordinary circumstance caused by mental impairment.

Nonetheless, the undersigned need not decide whether this period alone would support tolling, because even assuming it would, Petitioner has not shown that his impairment caused the delay in the periods that followed.

ii. Late 2015 through 2019

By approximately late 2015, Petitioner's uncle had learned that the time to appeal had passed and had told Petitioner so. (*See supra* Findings of Fact ¶ 11.) For roughly the next three and a half years, Petitioner did nothing to pursue relief, and he did not seek assistance from anyone. (*See id.* ¶ 15.) The question under *Bills* is whether Petitioner's impairment prevented him

from "locating assistance or communicating with" it. 628 F.3d at 1101. The record shows that it did not.

*First*, Petitioner was capable of identifying a need he could not meet on his own and asking others for help. He did so routinely, obtaining help from many different prisoners to read and write his correspondence and to prepare catalog orders. (*See supra* Findings of Fact ¶ 9.) In 2017, he pursued an administrative grievance through more than one stage, telling a CDCR evaluator that it was his idea and that he had help only with the writing. (*See id.* ¶ 13.) Petitioner's own expert agreed that if Petitioner wanted something, "he would ask someone for help, for sure," and that he would seek help from someone he trusted. (*See id.* ¶ 16.)

*Second*, assistance was reasonably available. Petitioner had regular contact with his family, including in-person visits from his sister, and his uncle had already acted on his behalf once before. (*See id.* ¶¶ 9, 11, 14.) He met annually with correctional counselors and had access to counselors' office hours, housing officers, the law library and its clerks, and "legal beagles" (prisoners who offered legal help). (*See id.* ¶ 12.) He had a cellmate with whom he discussed his sentence. (*See id.* ¶ 10.)

*Third*, Petitioner understood that his conviction and sentence were something he wanted to challenge. He wanted to appeal on the day he was sentenced, and many years later discussed his sentence with Mr. Franseca. (*See id.* ¶¶ 6, 10.) And for roughly eight years he kept the boxes containing his appellate record, taking all of his documents with him from Ironwood to Calipatria and retaining them through his later transfers, until he gave Mr. Marquez "everything I had" in 2019. (*See id.* ¶¶ 7-8.) That conduct reflects an appreciation that the papers mattered to his case. Petitioner did not need to understand habeas corpus or AEDPA to exercise reasonable diligence; he needed only to ask someone he trusted whether anything could be done. *See Bills*, 628 F.3d at 1100 (diligence is measured "to the extent [petitioner] could understand" his claims).

Petitioner offers two explanations for his inaction. He contends that, because of his conceptual deficits, he "did not know what he did not know" and so could not recognize the need for help. (4EHT 85; Doc. 120 at 9-10.) And he contends that his impairment caused him to adhere rigidly to the pretrial advice not to share his legal papers. (Doc. 120 at 10.) Neither explanation

establishes that his impairment was a but-for cause of the delay.

As to the first, the evidence shows that Petitioner wanted to appeal and discussed his case and his sentence with a fellow prisoner. (*See supra* Findings of Fact ¶¶ 6, 10.) This is not a case in which the petitioner was unaware that he had any grievance to pursue. As to the second, Petitioner's decision not to share his papers was a choice, not an incapacity. Petitioner testified that he would have "[j]ust put [the papers] away" and would not have had anyone read them "because I don't want to share nothing with nobody." (*See id.* ¶ 7.) The pretrial advice did not prevent him from asking a family member, his counselor, or Mr. Franseca whether anything could be done, none of which required sharing his papers. And when a trusted friend vouched for Mr. Marquez, Petitioner set the rule aside at once and turned over everything he had kept. (*See id.* ¶ 17.)

Petitioner argues that his impairment kept him from recognizing that the pretrial advice no longer applied after his conviction. (Doc. 124 at 38.) Even accepting that premise, the advice concerned only his papers. It did not stop him from discussing his case and his sentence with Mr. Franseca, and it did not prevent him from asking anyone whether anything could be done. (*See supra* Findings of Fact ¶ 10.) That is the opposite of the circumstance in *Forbess*, where the petitioner's delusion was such that "nothing anyone might have said" would have altered his behavior. 749 F.3d at 841. Here, a single suggestion from a trusted friend changed Petitioner's behavior immediately. Courts in this district have held that a prisoner's reluctance to trust other prisoners with legal materials does not excuse years of inaction and entitle him to equitable tolling. *See McCoy v. Sisto*, No. CIV S-08-1104 EFB P, 2010 WL 455464, at *3 (E.D. Cal. Feb. 3, 2010).

The undersigned is mindful that Petitioner's impairment may have made it harder for him to recognize the value of seeking help, and that he required effective-communication accommodations and did not progress beyond Adult Basic Education I. (*See supra* Findings of Fact ¶ 4.) But those facts show that Petitioner needed help to pursue relief, not that his impairment prevented him from seeking it. *Bills* requires a petitioner who cannot proceed alone to "diligently seek assistance and exploit whatever assistance is reasonably available." 628 F.3d at

1101. Petitioner did not seek assistance at all; it came to him. (*See supra* Findings of Fact ¶ 17.) The undersigned finds that Petitioner's impairment was not a but-for cause of his failure to pursue relief between late 2015 and 2019.

iii. <u>2019 through July 4, 2022</u>

Separately, Petitioner is not entitled to tolling because he has not accounted for the delay after he obtained assistance. Once Mr. Marquez began helping him in 2019, Petitioner's impairment no longer stood in the way of filing. With that help, Petitioner filed three state habeas petitions and a federal petition. (*See supra* Findings of Fact ¶ 20.) His "demonstrated ability to file state habeas petitions during the relevant period indicates that [his] mental impairment did not make it impossible to timely file." *Blackman*, 122 F.4th at 382; *see Yeh*, 751 F.3d at 1077-79.

Petitioner does not explain why, after meeting Mr. Marquez in 2019 and visiting the law library as early as July 2019, he did not file his first state petition until November 17, 2020, or why, after the California Supreme Court denied relief on October 13, 2021, he waited 264 days to file in this Court. (*See supra* Findings of Fact ¶¶ 19, 20.) Petitioner argues that his impairment prevented him from monitoring Mr. Marquez's work. (Doc. 120 at 9.) A petitioner who relies on assistance may obtain tolling if his impairment prevented him from monitoring that assistance and monitoring would have prevented the delay. *Milam*, 953 F.3d at 1133; *Blackman*, 122 F.4th at 388. But Petitioner bears the burden, and there is no evidence of why these delays occurred, let alone that monitoring would have prevented them. Mr. Marquez did not testify. Absent such evidence, any delay attributable to Mr. Marquez is thus attributable to Petitioner. *See Blackman*, 122 F.4th at 382.

The delay is fatal even under the approach most favorable to Petitioner. Assuming Petitioner were entitled to tolling through December 31, 2019, and then to a fresh limitations period (an approach *Smith* rejects, 953 F.3d at 599-601), 321 days would have elapsed before he filed his first state petition on November 17, 2020. Even assuming that period were tolled until the California Supreme Court's October 13, 2021, denial, the remaining 44 days would have expired in late November 2021, more than seven months before Petitioner filed his federal petition. Under the correct approach, which asks whether Petitioner was reasonably diligent up to

the time of filing, the unexplained delays of at least ten months before the first state filing and of nearly nine months before the federal filing likewise show that Petitioner's impairment was not the but-for cause of his untimeliness. *Smith*, 953 F.3d at 598-601.

*4. The authorities identified by the undersigned*

The authorities the undersigned directed the parties to address support this conclusion. In *Blackman*, the Ninth Circuit held that a petitioner who had access to and used assistance, and who filed multiple state petitions during the relevant period, failed the second *Bills* prong. 122 F.4th at 383-88. Petitioner distinguishes *Blackman* on the ground that he had no comparable assistance during the limitations year. (Doc. 120 at 11.) But the question is not only what assistance Petitioner had, but what assistance was reasonably available and whether his impairment prevented him from seeking it; and once he obtained assistance, Petitioner, like Blackman, filed repeatedly and still did not file timely. In *Stancle*, the petitioner's lack of diligence in pursuing state remedies precluded equitable tolling because he "had the continual assistance of [a jailhouse lawyer] in filing both his federal and state habeas corpus petitions." 692 F.3d at 958-59. In *Orthel*, the court denied tolling where the record showed extended periods during which the petitioner functioned capably. 795 F.3d at 939-40. Petitioner correctly observes that his impairment, unlike Orthel's, did not wax and wane. (Doc. 120 at 12.) But the relevant point here is not that Petitioner's impairment improved; it is that his impairment did not prevent him from doing what diligence required of him, which was to ask for help. Applying the *Bills* test, courts in this district have likewise denied equitable tolling where the record showed that, even assuming the first prong of the test was satisfied, the petitioner was not diligent in pursuing his claims to the extent he could understand them, including by locating and requesting assistance. *Stalling v. Baughman*, No. 2:16-cv-2083 GEB DB P, 2018 WL 827401, at *5-7 (E.D. Cal. Feb. 12, 2018); *Reynaldo v. Arnold*, No. 2:15-cv-2182 KJM DB P, 2017 WL 3981602, at *3-9 (E.D. Cal. Sept. 11, 2017).

*Forbess* and *Chatman*, on which Petitioner relies, are distinguishable. In *Forbess*, the petitioner's delusional belief that he was working with the FBI meant that nothing anyone said would have changed his behavior. 749 F.3d at 841. Here, Petitioner changed course immediately

once a trusted friend suggested he accept help. In *Chatman*, the Ninth Circuit held that the district court erred by failing to consider the petitioner's intellectual disability, together with severe mental illness, in assessing the first *Bills* prong, and noted that the petitioner had repeatedly attempted to secure assistance from other inmates. 585 F. App'x at 727-28. The undersigned has fully considered Petitioner's intellectual impairment here, and has assumed in his favor that the first prong is satisfied. Unlike the petitioner in *Chatman*, however, Petitioner made no attempt to obtain assistance for years.

*5. Calculation of the tolling period*

Petitioner seeks equitable tolling from July 16, 2013, through July 4, 2022, a period of 3,275 days. (Doc. 120 at 5.) For the reasons above, Petitioner has not shown that his impairment was a but-for cause of the delay from late 2015 through 2019, or from 2019 through July 4, 2022. Because even the most favorable tolling of the earlier period would not render the petition timely, Petitioner is not entitled to equitable tolling, and the petition is therefore untimely.

**C. Remaining Matters**

Petitioner's request for leave to amend the petition (Doc. 120 at 15) should be DENIED as moot. Respondent's request for judicial notice of the California Court of Appeal docket in case number F084180 (Doc. 122 at 2 n.1; Doc. 123 at 6 n.5) should be DENIED as unnecessary to the resolution of the motion.

## V. CONCLUSION AND RECOMMENDATIONS

For the reasons set forth above, the undersigned **RECOMMENDS** that:

1. Respondent's motion to dismiss (Doc. 11) be **GRANTED**;
2. The petition for writ of habeas corpus (Doc. 1) be **DISMISSED WITH PREJUDICE** as untimely;
3. Petitioner's request for leave to amend be **DENIED** as moot;
4. Respondent's request for judicial notice be **DENIED** as unnecessary;
5. The Clerk of Court be directed to enter judgment and close the case; and,
6. The Court decline to issue a certificate of appealability.

These Findings and Recommendations are submitted to the United States District Court

Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within seven (7) days after being served with a copy of these Findings and Recommendation, a party may file written objections with the Court and serve a copy on all parties. *Id.* The document should be captioned, "Objections to Magistrate Judge's Findings and Recommendation" and shall not exceed fifteen (15) pages, except by leave of court with good cause shown. The Court will not consider exhibits attached to the Objections. To the extent a party wishes to refer to any exhibit(s), the party should reference the exhibit in the record by its CM/ECF document and page number, when possible, or otherwise reference the exhibit with specificity. Any pages filed in excess of the fifteen (15) page limitation may be disregarded by the District Judge when reviewing these Findings and Recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014). This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment.

IT IS SO ORDERED.

Dated: **November 13, 2026**

Erin Sny Castillo
UNITED STATES MAGISTRATE JUDGE